CITY OF TALLAHASSEE, a municipal corporation organized and existing under the laws of the State of Florida, v. R. S. ASHMORE.

CITY OF TALLAHASSEE, a municipal corporation organized and existing under the laws of the State of Florida, v. LOUISE C. ASHMORE, joined by her husband, R. S. ASHMORE.

27 So. (2nd) 660     June Term, 1946

October 25, 1946     Division B

Rehearing denied November 19, 1946

74

*W. J. Oven, Jr.,* and *James Messer, Jr.,* for appellant.

*Evan T. Evans, R. W. Ashmore, B. K. Roberts* and *Rodney Durrance,* for appellee.

BROWN, J.:

Both of these appeals were taken by the defendant below from judgments entered in two separate actions against the City of Tallahassee, one by Mrs. Louise C. Ashmore, joined by her husband, for damages resulting from personal injuries sustained by her in a collision between appellant's truck and the automobile which she was driving, and the other in an action by her husband, R. S. Ashmore, for damages sustained by him arising from the same collision, such as medical and hospital expenses, doctors and nursing bills, damages to the automobile, and loss of consortium, etc. The two cases were tried together.

The collision took place within or just to the South of the traveled portion of the intersection of Copeland Street, which runs North and South, and Carolina Street, which runs East and West. Close on either side of the traveled portion of both these streets there were ditches about two feet deep, which, according to the map in evidence, do not cross either street, but come together near each corner of the traveled portion of the intersection. There is also shown on the map a one-story frame store building with a front porch four feet wide near the N. W. corner of the intersection, which building fronts on Copeland Street and is about 19 feet from the traveled portion of Copeland Street, and about 18 feet from the traveled portion of Carolina Street. And the map also shows a fire hydrant about 34 feet South East of the center of the intersection, which hydrant is 12 feet South of the ditch running along the South side of the traveled portion of Carolina Street, and about 3 or 4 feet East of the edge of the ditch which runs along the East side of the traveled portion of Copeland Street. The map indicates that both these streets are sixty feet wide from property line to property line, but the only portions of same which are suitable for travel are about 23 to 25 feet wide.

The defendant City, appellant here, introduced in evidence an ordinance of the City which, among other things, provided that: "Every driver of a vehicle approaching the intersection of a street shall grant the right of way at such intersections to any vehicle approaching from his right," etc.

In the case of Toll v. Waters, 138 Fla. 349, 189 So. 393, the appellant assigned as error a charge given by the trial Judge, reading as follows:

"The Court charges you that the one who arrives at the intersection first when proceeding lawfully and with ordinary care and caution is ordinarily entitled to the right of way, regardless of statute or ordinance giving the right of way to one or the other. Such provisions apply only when both arrive at the intersection at approximately the same time."

This Court called attention to this charge and while not expressly ruling thereon, impliedly approved it by affirming the judgment. The charge thus impliedly approved by this

court seems to be in line with the general weight of authority. See 5 Am. Jur. 666, Section 297 and 298. Also Blashfield's Cyclopedia of Automobile Law, Vol. 2 p. 202, Sec. 1030.

In this case the trial Judge, among other things, charged the jury as follows:

"I further charge you, gentlemen, that the violation of the ordinance introduced in evidence is evidence of an act of negligence and that, if the jury believes that the plaintiff driver was violating said ordinance at the time of the accident and shall further believe that such negligence proximately contributed to the damages the plaintiff herein claims to have suffered, that it would be your duty to find for the defendant.

"Accordingly, gentlemen, it is the duty of the driver of a motor vehicle about to cross a street intersection in the City of Tallahassee, Florida, to look to the right for approaching vehicles, and this duty implies the duty to see what is in plain sight, if anything, unless some reasonable excuse for not seeing is shown. Such motorist must use due care, commensurate with obvious conditions and the fact that he or she is crossing a street intersection. But the right of way which is given to one under the Ordinance introduced in evidence is not an absolute right which may be exercised under all conditions, but if to the one to whom the right of way is granted, in the exercise of ordinary care, it appears that to insist upon the right of way would probably result in a collision, it would be the duty of such person to use ordinary care to avoid a collision even to the extent of yielding his right of way, and his failure to do so under those conditions, would be evidence of negligence on his part."

In this general connection see Turner v. Modern Beauty Supply Co., 152 Fla. 3, 10 So. (2nd) 488; and also, Allen v. Hooper, 126 Fla. 458, 171 So. 513, wherein this court said:

"The violation of traffic law is *prima facie* evidence of neglect, but that *prima facie* evidence may be overcome by proof of surrounding circumstances and conditions which will eliminate the character of negligence from the transaction. Therefore, when it is shown that the traffic law has been violated it is a question for the jury to determine from all the facts and circumstances whether or not the prima facie of

negligence is overcome by other evidence of existing facts and circumstances."

Coming now to the evidence in this case, the plaintiff Mrs. Ashmore, testified that on the morning of February 3, 1943, she was driving her car south on Copeland Street shortly after 9 o'clock on her way to her work as a stenographer and book-keeper for a business concern located about a mile South of the place where the collision occurred. As she approached the intersection she was going very slowly because the dirt road was rough and there was a washed out place in it almost across the street, and she was driving on the extreme right side to avoid this bad place in the street. Both the streets were unpaved. She had to go slightly upgrade approaching the intersection and almost came to a stop before entering it. When she got to the usual distance that any one would look for approaching cars, which could usually be seen about half a block, she looked to the right and didn't see any cars approaching, so she slipped into second gear and proceeded on across the intersection at not more than ten or fifteen miles an hour. It was before she got into the intersection that she looked, and not seeing any other vehicle approaching, she entered the intersection and had passed the middle of the intersection when her car was struck by defendant's truck about the door on the right hand side of her car. That it was a "terrific impact" which turned the car completely over and she was crushed beneath it. Her car was turned over on the fire hydrant, which penetrated into the top of the car. This fire hydrant was located about 12 or 13 feet South from the ditch on the South side of Carolina Street. When she realized anything everything seemed smoky and dark and she had great difficulty in breathing. That after the impact she could hear voices and after several efforts they were able to lift the car up and take her out and lay her on the ground. From there she was taken by an ambulance to the hospital. That both of her shoulders were broken and subsequent examination by her physician showed that seven of her ribs were broken, the ends of the broken ribs lapping over each other. That she suffered great pain and was extremely nervous and had to have three nurses a day on continuous duty for some weeks.

Her testimony in this respect was supported by Dr. Rhodes her physician. She testified that before the accident she was employed by Mr. D. M. Lewis. That she had been working at the same place for fifteen years and at the time of her injuries her salary was $200.00 per month. That some time after this accident she tried to go back to work but found that she was unable to do so and had to give up the job which had been held open for her. On the morning of the accident she was due at the office at 9:30, so when she reached the intersection above referred to she had fifteen or twenty minutes in which to drive to the office and was therefore not in any hurry. She was thirty four years of age at the time of the accident and thirty seven at the time of the trial.

Plaintiff's witness Charles Clark testified that he took Mr. Ashmore to the scene of the accident and when they got there the Ashmore car had been turned right side up again and one of the doors was lying on a lawn near by, that there was a hole about the center of the top of the automobile where it had turned over on the fire hydrant. He found some pretty deep marks where the truck driver had put on the brakes, the position of which he indicated on the map, which showed that the truck had swerved slightly to the driver's right at the intersection. Mr. R. S. Ashmore, the husband of the injured woman, testified that after he had taken his wife to the hospital, he came back and inspected the scene of the collision. He said that the wheel tracks of the truck showed that when the driver got to the corner of the intersection he cut South to some extent, the same direction in which the automobile was going; that from the tracks of the wheels the driver of the truck had put on the brakes thirty one feet West of the intersection; that the tracks indicated that the wheels had dragged that distance before entering the intersection, evidently referring to the traveled portion of the intersection, and indicated that the driver of the truck was cutting South, but that all the tracks had all been stamped out in the intersection itself and he could not follow the truck tracks any farther. Mr. Ashmore said he also examined his car, which had not been moved except to set it back on its wheels, and found that it was in second gear. There was not a scratch on

the car except where it had been hit on the right door "that one time." and the wheel marks on the street indicated that the car, when it was struck, had been "dragged" East for a distance of four or five feet before it turned over, opposite the fire plug. The witness identified the photographs of the automobile made after the collision which were introduced in evidence. He also testified as to his wife's sufferings and the extent of her disability to work after her injuries, from which she still suffered pain, and the amount he had paid out for hospital, nurses and medical expenses.

At this juncture in the trial, at the request of the plaintiff, the court permitted the jury to visit the scene of the collision in the custody of a deputy sheriff.

Thereafter plaintiff placed the Vice President of one of the Tallahassee banks upon the stand and asked him to turn to page 351 of volume 27 of Florida Statutes, Annotated, where the American Experience Tables of Mortality appear and thereby proved that a woman 34 years of age, according to that table, would normally be expected to live 32½ years. (We might mention that at age 37, Mrs. Ashmore's age at time of trial, the life expectancy would be, as per the table, 30.35 years). Then he was asked to turn to the Annuity Table on page 358 of the same volume and asked him to tell the jury what would be the present worth of $1.00 per year to a person 34 years of age and he replied $12.969, or approximately $13.00, which meant that $13.00 invested at 6 per cent interest would pay such a person $1.00 per year for her natural life, and that to pay such person $2400.00 per year during life expectancy, would require $31,200.00, on a 6 per cent basis. It was also found by the tables that Mr. Ashmore now 47 years of age, had a life expectancy of a little over 23 years. At the close of this testimony, the defendant moved that the witness's testimony be stricken on the ground that such testimony was incompetent. The court denied the motion.

The defendant placed on the stand the driver of the defendant's truck at the time of the collision, one Griffin. He said that he was going East on Carolina Street and as he approached the intersection in question, a car was coming from his left and he tried to stop "and she came out in front of me

and I struck her." When he first saw plaintiff's car he was about 50 feet from the center of the intersection of Carolina and Copeland Streets and that plaintiff's car was about twice that distance from the center of the intersection, between 80 and 100 feet therefrom, and that she was driving around 30 miles per hour while the truck was traveling about 15 miles per hour. He said that when this other car came into view he tried to stop. That he put on his brakes and that skidded the wheels, for a distance of 12 to 15 feet; that the other car was going South and was to his left. When asked if there were any structures on the Northwest corner of the intersection of those two streets that would obstruct his view he answered "there was a small store there." After the impact, the defendant's car turned over and his truck moved four or five feet from where the impact was. He saw the driver of the other car before she reached the center of the intersection and that she was looking almost straight ahead, and did not slacken her speed. The collision took place à little bit South of the center of the intersection; that plaintiff's car entered the intersection at the same time that he did and maybe a little ahead of him; that after the other car came into view neither he nor the driver of that car swerved either vehicle. He did not think there was any washout across Copeland Street North of the intersection. He indicated with pencil on the map the point of impact between the truck and the automobile, making an X mark at that point. This map was introduced in evidence and accompanies the record in this case and the X mark indicates that the plaintiff's car was just to the right, or west, of the center of Copeland Street and lacked only a few feet of being out of the intersection entirely. He said that his brakes were in good condition and worked effectively and that he applied them as soon as he saw the plaintiff's car. On cross examination he stated that when he first saw plaintiff's car it was between 80 and 100 feet from the intersection and that he guessed that she was between 80 and 100 feet from him when he applied his brakes and that he was 50 feet from the intersection when he saw plaintiff's car and that he was driving 15 miles per hour. He was then asked this question: "Then it is a fact that, traveling 15 miles per

hour, you could not stop in 50 feet?" He answered: "I didn't stop." He was then asked this question by plaintiff's counsel: "Then, you say, traveling 15 miles an hour and with 50 feet in which to apply your brakes, which you did at once, you struck this car a little to the South of the intersection?" His answer was: "Thats right." He further testified that when his truck hit the car, it knocked the car against the fire hydrant and turned it over on top of the hydrant, and his truck stopped in 4 or 5 feet from the point of impact. At that time, he had been employed by the City a little over a week.

The defendant then placed the Assistant City Engineer on the stand, who had made a map of the area in question and he testified that a person standing at the South side of the ditch on the North side of Carolina Street could see down Carolina Street to the West approximately a thousand feet, to Dewey Street which is the next street West of Copeland, there being nothing to obscure the vision.

We are giving due consideration to the map and the various photographs which were introduced in evidence by the respective parties. The photograph of plaintiff's car indicates that it was a two-door five passenger car.

So much for the pertinent evidence in the case as we understand it from the record.

The Court's charge to the jury was quite fair to both the plaintiffs and the defendant and we find no reversible error therein.

Appellant insists that the court was in error in declining to give charges 3, 4 and 5, requested by the defendant in the court below and cites in support of this contention Gosma v. Adams, 102 Fla. 305, 135 So. 806, and Redtop Cab and Baggage Co. v. Rathermund, 153 Fla. 321, 14 So. (2nd) 665. The facts in those two cases were so dissimilar to the facts in this case, that neither of these cases are in point here. Charge number 3 above referred to asks the court to charge that a person who operates a motor vehicle in violation of a valid municipal ordinance, such an act on the part of the operator is negligence in itself and that if the jury should find from the evidence that the plaintiff, Louise C. Ashmore failed to grant

to the defendant's vehicle the right of way at the street intersection in violation of the City ordinance, then their verdict should be for the defendant. Requested charge number 4 is substantially the same as the preceding charge. Requested charge number 5 goes a bit further and says that the driver who has the right of way at a street intersection has the right to assume that the driver of the other vehicle will not drive directly in his path and will wait if necessary until the intersection is clear before entering such intersection, and that in this case the defendant's driver had the right to assume that the plaintiff would observe the law of the road and grant him such right of way and would not drive her vehicle in front of him. This charge is abstract because the appellant's truck driver testified that he saw Mrs. Ashmore's car when he was 80 or 100 feet away from it and he observed that she was looking practically straight ahead as she entered and passed through the intersection. Under these circumstances he had no right to assume that Mrs. Ashmore would grant him the right of way, and it became his duty to make every practicable effort to avoid running his truck into her car. The jury might well have believed from the evidence in the case that the driver of the truck not only failed to put on his brakes as promptly as he should, but that he was negligent in not turning somewhat to the left instead of slightly to the right in the direction in which she was going. In other words, the jury could well have found on this evidence that if the driver of the defendant's truck had exercised ordinary care he could have avoided the collision out of which this case arose. On this evidence the jury evidently reached the conclusion that the sole efficient proximate cause of the collision and the serious injuries to the plaintiff Mrs. Ashmore was the negligence of the defendant's truck driver.

In the case of Franzee v. Gillespie, 98 Fla. 582, 124 So. 6, this Court, inter alia, said:

"Even if we admit the negligence of the plaintiff in turning to cross the path of the rapidly approaching car when it was only 150 feet away, it would still be a serious question, under the testimony in this case, whether the subsequent negligence of the defendant, in driving rapidly on without observing the

plaintiff's attempt to cross in front of him until too close to avoid the collision, intervened in such a way as to constitute the sole efficient proximate cause of the collision and consequent injuries. See, in this connection, Fla. Motor Transp. Co. v. Hillman, 87 Fla. 512, 101 So. 31."

See also Dunn Bus Service, Inc. 130 Fla. 778, 178 So. 865.

In this case it is certain that when Mrs. Ashmore drove into the intersection and saw no other vehicle entering it at that time, and although the defendant's truck driver saw her 80 to 100 feet away as she was entering or about to enter the intersection, he struck the Ashmore car South of the center of the intersection with such force as to push it 4 or 5 feet sideways, deflecting it from its Southward line of travel into nearly an Eastward course, and knocking it from 26 to 32 feet up against a fire hydrant on the other side of the ditch on the East side of Copeland Street and turning the car upside down on top of the fire hydrant. The truck hit the car in the middle of the right hand side such a hard blow that the recoil was practically instantaneous, leaving no side-swipe marks visible on the car. It is fair to presume that the car was lifted almost instantaneously by the impact and sent through the air across the ditch until it struck the fire hydrant and turned bottom side up thereon.

Counsel for appellees cite the case of Toll v. Waters, supra; Turner v. Modern Beauty Supply Co. supra; Allen v. Hooper, supra, and C. W. Zaring & Co. v. Demis, 155 Fla. 157. 19 So. (2nd) 701.

In the case of Seaboard Airline Railroad Co. v. Watson, 94 Fla. 571, 113 So. 716, it was said:

"It is negligence which proximately causes or contributes to causing the injury or damage which creates legal liability. There may be concurrent causes of a single injury—concurrent negligence of two separate and distinct agencies—which, operating contemporaneously, together constitute the efficient proximate cause of the injury inflicted, and without either one of which the harm would not have been done. But, if two distinct causes are successive and unrelated in their operation, they cannot be concurrent. One of them must be the proxi-

mate and the other the remote cause, and the law will regard the proximate as the efficient and responsible cause, disregarding the remote cause."

As above shown, the testimony of the bank officer based upon the American Experience Tables and the Annuity Tables contained in the Florida Statutes Annotated was with reference to the age of 34 years, which was the age of Mrs. Ashmore at the time of the collision. As evidence had only been introduced showing the loss of earnings during the three year period between the time her injuries were received and the time of the trial, and which losses were continuing up to that time and would probably continue for the balance of her life, the court was not in error in denying the motion to strike the testimony as a whole on the ground that it was incompetent. The motion to strike did not state why it was incompetent. The court's charge with reference to damages was quite full, complete and correct. The Judge charged the jury that if they found for the plaintiff, Louise C. Ashmore, they should allow her such damages under the facts and circumstances in evidence as would be a fair and just compensation for the injuries she had sustained, and that they might take into consideration the pain and suffering occasioned by the injuries and the effect on her health and condition by reason thereof, the money she was making in her occupation, and her loss of time, if any, and the effect, if any, of the injuries in the future upon her health in attending to her affairs generally and in pursuing her occupation, and to allow her such damages under the facts in evidence as would be a fair and just compensation for injuries she sustained; that if they found that the plaintiff had been permanently injured or disabled, such damages as the jury might allow therefore must be reduced to their present money value. Then the court added this paragraph:

"Certain evidence has been introduced involving mortality tables, and certain evidence has been introduced with respect to the value of the plaintiff's life expectancy, with reference to the value of her future earning capacity. This evidence is to be weighed and considered by you along with and in connection with all the other evidence in the case, and then only if

and when you determine that there are permanent injuries;—that there are permanent injuries to the plaintiff's wife."

It may well be, however, that the jury in arriving at their verdict took into consideration the loss of salary at the time of the injuries to the time of the trial, a period of about three years, and also the amount shown by the tables above referred to, based on age 34. However, a reference to the tables and mathematical calculation made thereon shows that there was only a difference of about $435.00 in the present value as between ages 34 and 37. The tables show that the present value of a life annuity of $1.00 per annum at age 34 is 12.969 whereas such present value based on age 37 would be 12.655. The jury's verdict in favor of Mrs. Ashmore was for $19,200.00 which was evidently based on the table for age 34; so it seems that the greatest possible error the jury could have committed by the use of the mortality table is, as the writer concludes, $435.00. We think that this verdict could well have been larger on account of elements of damages shown by the evidence, but in view of all the circumstances we think that the verdict and judgment in Mrs. Ashmore's case should be reduced in that amount.

If the plaintiff, Louise C. Ashmore, shall upon the going down of the mandate in this case, consent for the court below to enter a remittitur of $435.00 from the verdict and judgment in her favor, said judgment and verdict so reduced, shall stand affirmed; otherwise, it shall stand reversed for a new trial.

The judgment in favor of appellee R. S. Ashmore is Affirmed.

It is so ordered.

CHAPMAN, C. J., THOMAS and SEBRING, JJ., concur.